FILED
CLERK

2:20 pm, Aug 05, 2024

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                              **MEMORANDUM OF
                                                              DECISION &**
                              -against-                       **ORDER**

DANIEL COLUCCI,                                               23-CR-417 (GRB)

                              Defendant.
-------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

Most judges would agree that, under ordinary circumstances, sentencing represents their most difficult and complex responsibility: after considering the advisory United States Sentencing Guidelines, a broad array of statutory factors must be carefully applied to the factual circumstances of each case and tailored to the individual defendant in an effort to effect justice and the statutory requisites. In this case, the determination is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: the dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn.

*Relevant Facts in Determining the Appropriate Sentence*

This case involves a significant tax fraud, including a dozen counts of conviction and nearly $1 million dollars wrongfully diverted from federal taxing authorities. The defendant misappropriated sums withheld from his employees' paychecks that were intended for tax payments and intentionally failed to make employer matching contributions. Crimes against the public fisc—funds intended for the maintenance of Government programs to benefit the public good—are very serious. Yet this crime goes beyond a simple theft of tax monies. In this case, the defendant took money from the Government and his employees—people who generated

1

income for him through their time and effort on behalf of his business—and who were left holding the idiomatic bag.  They were subject to tax problems, faced IRS reviews and penalties, had Social Security issues and were denied refunds.  When confronted, the defendant lied to them, falsely denied knowledge of his misdeeds and misdirected them to his accountant.   Four of defendant's former employees appeared at the sentencing hearing to describe the impact defendant's machinations had upon them.

In these circumstances, it is this Court's duty to consider the Guidelines, balance the § 3553(a) factors and craft an appropriate sentence—one that is sufficient but not greater than necessary to effect the statutory goals.  The advisory United States Sentencing Guidelines suggest a term of imprisonment of 18 to 24 months.  In this Court's view, this is a case that, particularly in light of nature of the offense, the significant violation of trust, and the need for general deterrence, warrants a term of incarceration.  When this defendant decided to steal close to $1 million of withholdings and related contributions—money that belonged to his employees as well as sums he was obligated to pay to the federal government as the result of operating a profitable enterprise—he must have known that a likely outcome of that decision was a term in a federal prison.  But he did it anyway.  The reasons that the defendant, an individual of substantial means, carried out this scheme, remain something of a mystery.

Though defendant pled guilty, and is getting credit for acceptance of responsibility, there are reasons to question the depth of his remorse.  For example, according to the Pre-Sentence Report, a document the defendant reviewed with his counsel and was given opportunity to correct, his spouse stated that if the defendant were sentenced to incarceration, "her only form of income would be her social security benefits, and she did not think that would be sufficient to support herself."  PSR, Docket Entry ("DE") 7 ¶ 36.  Meanwhile, that same document reports

more than $1.4 million in cash and securities held in accounts solely in the spouse's name, and the couple jointly has a net worth of more than $5 million. *Id.* ¶ 57. While the Court does not hold the defendant accountable for misstatements by his spouse, the failure to correct the record proves troubling. Moreover, that the defendant has substantial assets renders his decision to pilfer nearly $1 million from his employees and the Government inexcusable. Finally, though the issue has now been remedied, the defendant appeared somewhat reticent to make full restitution in this matter, having delayed making payments for years despite having the means to do so.

At the same time, the Court recognizes that this was aberrant behavior on the part of the defendant in an otherwise productive life, and that he has levels of community support attesting to otherwise good character. Moreover, the Court must also consider that, at 74, the defendant is at a relatively advanced age and has indication of some medical problems, including a recent cancer diagnosis. As to that, though, the record is rather scant as to the future medical implications. On balance, however, the § 3553(a) factors, including the seriousness of the offense, promotion of respect for the law, just punishment, and adequate deterrence to criminal conduct demand that some period of incarceration be imposed.

**The Conditions at MDC**

*"What are you waiting for, another loss of inmate life?"*

- Rhonda Barnwell, President,
Government Employees, Local 25[1]

At this moment, though, the Court is faced with a problem that lies outside the confines of this case.  For several years, beginning with the COVID-19 pandemic, allegations have swirled around the conditions at the MDC, the only federal prison facility in this district and serving this region.[2]  And this problem affects most bail and sentencing determinations made by this Court.

The issues at MDC are not limited to circumstances that were necessitated by the COVID pandemic—a period in which prison officials were forced to resort to extreme measures to contain a deadly virus that could well have wreaked havoc within their facilities.  As a result of those circumstances, in which prisoners were regularly subject to 24-hour lockdowns and related deprivations, it has become "routine for judges in both [the Southern] District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC."  *United States v. Chavez*, No. 22-CR-303 (JMF), 2024 WL 50233, at *1 (S.D.N.Y. Jan.

---

[1] Ms. Barnwell posited this ominous interrogatory in an October 2023 memo decrying the staffing shortages and dangerous conditions faced by inmates and correctional officers at MDC. *Chavez*, 2024 WL 50233, at *2 n.9.  Given that there have been *at least two inmate deaths* since Ms. Barnwell's prophetic inquiry, a new question arises: what will it take before the situation is remedied?

[2] Until relatively recently, some pre-trial defendants in this district and the Southern District of New York were housed at the Metropolitan Correctional Center in Manhattan.  That facility was closed in mid-2021 due to deteriorating conditions, and the principal responsibility for housing all inmates from the two districts fell to MDC.  One might expect that, having shuttered MCC, officials of the BOP would shift substantial resources and personnel to MDC, ensuring that the institution would be up to the task.  Alas, this does not appear to have been the case.

4, 2024).  Indeed, the undersigned has frequently and explicitly reduced sentences imposed to help offset the excesses of COVID-era incarceration.

Allegations of inhumane treatment at MDC continue, however, and judges in this district are subject to a steady drumfire of such charges, often uncontested by prosecutors. And these issues continue to affect judicial determinations.  In *United States v. Chavez*, contrary to statutory presumptions, Judge Furman ordered that a narcotics defendant subject to a multi-year sentence remain at liberty pending surrender, based largely on the conditions at MDC.  2024 WL 50233, at *6.  In *United States v. Griffin*, No. 22-CR-408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024), Judge Komitee granted a motion for compassionate release based primarily on the conditions at MDC for a defendant serving time for violating supervised release. *Cf. United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("Given the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods.").  In yet another case, Judge Cogan indicated that he might have sentenced an offender to incarceration "if not for the length of the sentence landing him in the Bureau of Prison's Metropolitan Detention Center in Brooklyn."[3]

In *Chavez*, Judge Furman identified three areas of concern in the post-COVID conditions at MDC: (1) continued reports of inordinate periods of lockdown, (2) claims that the facility provides inadequate and/or substantially delayed necessary medical care—a particular risk in this case and (3) general issues about the conditions at the facility.  2024 WL 50233, at *5.

---

[3] "'Such a Weird Case': US Judge Sentences Platinum Partners Co-Founder to Six Months Home Confinement," *New York Law Journal*, July 16, 2024, available at https://www.law.com/newyorklawjournal/2024/07/16/such-a-weird-case-us-judge-sentences-platinum-partners-co-founder-to-six-months-home-confinement/?slreturn=20240620105128

Allegations of inadequate supervision, unbridled assaults and lack of sufficient medical care[4] are supported by an increasing body of evidence, with certain instances that are irrefutable.  *Griffin*, 2024 WL 2891686, at *3 ("it has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates").

That critical medical care is frequently delayed or denied within the facility seems no longer in doubt.  *Id.* (finding that MDC "has delayed medical care for a number of inmates"). On June 4, 2024, Michael Arthus, an assistant federal defender in the Southern District of New York, wrote a letter to the undersigned concerning a recent incident in which his client, a diabetic MDC inmate, reported losing consciousness in his cell.  *United States v. Bumpass*, 23-CR-183 (GRB), DE 31-36.  Notably, neither Mr. Arthus nor his client had a role in the case before this Court.  Due to MDC staffing shortages, Mr. Arthus reports, there were no guards on the unit.  As a result, a defendant being prosecuted here attempted to summon a corrections officer for help to no avail and then tried a panic button, which was broken and yielded no results.  While these conditions—prisoners locked down in housing units without any guards present combined with inoperable panic buttons—may seem unimaginable, it is well established that such deficits have been long persisted at MDC.[5]  According to Mr. Arthus, left with no alternatives, the inmate:

---

[4] Some other allegations—by way of example, oft-cited maggots in the food—remain unverified and may well, based upon some ongoing investigations, turn out to be exaggerated.

[5] *Chavez*, 2024 WL 50233, at *7 n.16 (corrections officer union official reporting that "on a daily basis housing units are left. unmanned by staff and locked down"); *7 ("the Court was advised that many, if not most, of the emergency call buttons in the MDC's main building are not working — even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown") (citing Letter from Loretta E. Lynch at 4, *Federal Defenders of New York, Inc.,* No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403 (reporting that the buttons remained "broken" as of November 30, 2023)).

spent the night nursing my client back to health: he placed cold towels on my client's head to wake him up and keep him awake, fed him sweets to bring his blood sugar back up, and stayed with him throughout the night to make sure he did not lose consciousness again.

*Id.* When individuals are confined in a federal facility, such exceptional acts should not be required to ensure basic safety and medical care.

While evidence of failures at MDC continues to accumulate, there is no complete public record of the problem, and the available information is contained in judicial opinions from two districts and sporadic media reports. In the pages that follow, the Court has endeavored to highlight some matters that have come to light recently to make determinations in connection with the sentencing in this case. The list is far from comprehensive; in fact, this Court lacks visibility into the overall issues. Furthermore, as another judge has previously observed, "there are far too many cases to cite." *Chavez*, 2024 WL 50233, at *1 n.3 (collecting "representative examples" of complaints of lockdowns, dreadful conditions and delayed medical care).

One case before this Court includes incontrovertible evidence submitted by the Government that highlights chaotic, unremedied lawlessness at the facility. That matter involves the prosecution of the "Route Boys," a robbery crew engaged in brazen, systematic thefts of extremely dangerous narcotics from pharmacies which were sold by members and associates using social media, including an Instagram account. The Government has submitted

photographs taken of and by gang members *while in their cells at MDC*, showing off their tattoos and flashing hand signs. *United States v. Lopez Dominguez*, 21-CR-451(GRB), DE 363 at 4.



*Members of the Route Boys posting photos via Instagram using contraband cell phones from inside their cells at MDC*

These photos, apparently created using smuggled contraband cellphones, have been posted on Instagram by gang members from MDC using the very same account the defendants used to sell stolen opioids before their arrest. *Id.*

While submitted to the Court in July 2024, the Government advises that these photos were first shared via several gang Instagram accounts between July and September 2022, approximately two years ago. *Id.*; DE 367 at 4 n.2. That the Government contemporaneously became aware of these activities within MDC and the legal violations, security issues and

possible public corruption attendant thereto is beyond doubt.  *Id.* at 4 ("Each photograph was screen shotted *[sic]* by a law enforcement agent on or about the date that it was posted on the respective Instagram accounts.").  One former MDC corrections officer, arrested in April 2023, was sentenced to 30 months after he "accepted tens of thousands of dollars from inmates in exchange for smuggling narcotics, cigarettes, and cell phones into the MDC."  Statement of United States Attorney Breon Peace, dated July 30, 2024.[6]  Yet, the situation at MDC nevertheless seems unchanged as "[c]ontraband—from drugs to cell phones—is widespread." *Chavez*, 2024 WL 50233, at *1 (collecting cases and media reports of illicit cellphones within MDC).[7]  The results of such anarchy are predictable.

*"Unchecked Violence" at MDC*

Chaos reigns, along with uncontrolled violence.  *Griffin*, 2024 WL 2891686 at *3 (describing rampant "violence and the threat of violence" at MDC).  Through review of sealed documents, official government statements, judicial opinions and news media reports, this Court has identified shocking instances of brutal violence within the facility.  This review is necessarily limited, as the Court's access to relevant information was exceptionally narrow.  In other words, there were, most certainly, other incidents not collected during this Court's review. Nevertheless, the results are staggering.

---

[6] Available at https://www.justice.gov/usao-edny/pr/former-federal-correction-officer-sentenced-prison-accepting-bribes-exchange-smuggling.

[7] In sealed, sworn documents filed with this Court, one defendant (Defendant 1) housed at MDC beginning in early 2024, raised detailed allegations documenting the ready availability of narcotics and weapons among MDC inmates, and of corrupt guards permitting the acquisition and use of cellphones by gang leaders, warning inmates about impending searches and permitting sexual and physical assaults within the facility.  While some of these sworn allegations have not been independently verified, others are supported by corroborating evidence, and investigation of certain claims is continuing.  The Government advised that at least some of Defendant 1's information was deemed credible.  To avoid risk of retaliation, Defendant 1 will not be further identified herein.

Each of the five months preceding this opinion was marred by instances of catastrophic violence at MDC, including two apparent homicides, two gruesome stabbings and an assault so severe that it resulted in a fractured eye socket for the victim.  One knife attack was captured on a surveillance video producing images that are horrifying beyond words.  The activities precipitating these attacks are nearly as unthinkable and terrifying as the ensuing injuries: drug debt collection, fights over illegal narcotics, resisting an organized gang robbery, internecine gang disputes and as-yet-unidentified "brawls."  A summary of the available facts underlying each of these events follows:

**March 2024** - Defendant 2 was awaiting sentencing for conviction on a single firearms possession count.[8]  According to sealed filings by Defendant 2, his attorney and the United States Probation Department, Defendant 2 reports being stabbed repeatedly at MDC in March 2024, sustaining wounds to both arms, his abdomen and one knee.  The defendant reports receiving no medical care, but instead was simply locked in a cell in the Secure Housing Unit (SHU) for 25 days.  His attorney, an assistant federal defender, advised that the defendant had been attacked while resisting a robbery in the facility by gang members.

---

[8] To avoid risk of retaliatory violence, identifying details regarding Defendant 2 are not provided herein.

**April 2024** - According to information and photographs filed by the United States

Attorney in a criminal prosecution, three members of the MS-13 housed at the MDC attacked a fourth inmate with improvised knives, inflicting 44 stab wounds on his back, chest, abdomen, right arm and leg. *United States v. Rivas*, 18-CR-398(RPK), DE 363. The entire, brutal attack was captured on video. *Id.* That video, filed by the Government and recently made public, displays the lengthy, horrific assault, committed by inmates under no



apparent supervision. Reports suggest that the leader of the attack, serving 35 years for a near decapitation in an internecine gang dispute, is also serving time for stabbing a rival gang member in an NYC jail. "Unchecked Violence," *New York Daily News*, July 28, 2024. Viewing the security video footage[9] reveals many things: the three inmates perpetrated this organized, armed attack in an open area unimpeded by any supervision, the response to the event took an unconscionably long time, and the victim, suffering from 44 knife wounds, was left unaided while a few outnumbered corrections officers eventually attempted to pursue the attackers.

**May 2024 –** Christian Griffin had served about five weeks of a 90-day sentence at MDC for shoplifting while on supervised release. *Griffin*, 2024 WL 2891686 at *1. On May 15, he advised a corrections officer on his unit of a belief that he was in danger, requesting transfer to another unit. *Id.* No such action was taken. The next day, three inmates physically assaulted and severely beat Griffin, leaving him with "a fracture of the right orbital bone—a broken eye

---

[9] The video is available at https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/.

socket, in layman's terms—as well as a laceration to his right eye and swelling and bruising of the eye and face." *Id.* at *2.  He was treated at a hospital, where doctors advised that he required an ophthalmological consult and possible follow-up surgery.  While his face remained swollen and painful for weeks thereafter, MDC failed to provide any appropriate medical care. *Id.*

**June 2024 -** Extensive media reports indicate that on June 7, 2024, an inmate named Uriel Whyte was fatally stabbed in the neck in a dispute over drugs within the confines of the facility.[10]  In a letter to my colleague, Judge Azrack, who presided over Whyte's prosecution, the Government confirmed only that Mr. Whyte had "passed away."  *United States v. Whyte*, 21-CR-390(JMA), DE 52.  The death of Mr. Whyte appears to be subject of an ongoing investigation, yet there seems to be little doubt that Mr. Whyte was slain while at MDC.

---

[10] "Inmates Decry Conditions Inside Brooklyn Jail," *Spectrum News NY1*, available at https://ny1.com/nyc/all-boroughs/politics/2024/06/24/brooklyn-federal-jail-murder-conditions; Annese, J., "Inmate at Brooklyn's troubled Metropolitan Detention Center is stabbed to death: sources," *New York Daily News*, June 20, 2024.

**July 2024 -** About six weeks after the Whyte killing, on July 17, 2024, the Court was advised of a lockdown of the facility based upon a "grave security situation."  Subsequent reports revealed that this situation was, in fact, the apparent killing of another inmate during a physical altercation among prisoners housed at MDC. *See, e.g.*, Fadulu, L., "Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail," *The New York Times*, July 17, 2024.[11]  For days afterwards, the BOP website reflected that the facility remained on lockdown, as the site read "All visiting at this facility has been suspended until further notice."  This presumably arose from the second fatal attack upon an inmate at the facility in the space of six weeks.



Taken together, these incidents demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement.  And these conditions bear heavily on the determination by the Court in this case.

*Relation to the Instant Sentencing Problem*

If the Court imposes a sentence of a year or less in this case, the Bureau of Prisons ("BOP") may well direct that the sentence be served at the MDC.  Under current practice, immediate surrender of the defendant makes this possibility more likely, however, even if the

---

[11] Available at https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html

Court were to delay surrender until designation, the defendant may still be designated to serve the time imposed at MDC.  Given the age and medical condition of this defendant, such an outcome would offer unacceptable risks and would be inconsistent with the mandate to provide a sentence that is sufficient but not greater than necessary to satisfy the purposes of the sentencing statutes.

At the same time, this Court is precluded from designating a particular institution for the service of a sentence.  Section 3621(b) of Title 18, United States Code provides that the "Bureau of Prisons shall designate the place of the prisoner's imprisonment" and cautions that "a designation of a place of imprisonment under this subsection is not reviewable by any court."  In other words, "courts lack the authority to designate a defendant's place of incarceration when the defendant is sentenced to a term of prison." *United States v. Guiro*, 887 F. Supp. 66, 69 (E.D.N.Y. 1995)

As noted, the Sentencing Guidelines carry an advisory sentence of 18 to 24 months, and the Government advocates for a 15 month sentence.  Defense counsel has suggested that this Court should impose no period of incarceration, arguing among other things that other judges in the Eastern District of New York have opted to forgo short periods of incarceration because of the risks at MDC.  Indeed, sentencing arguments based on the reportedly deplorable conditions at MDC have become so commonplace that—quite understandably—counsel routinely raise the issue in a shorthand fashion, as lawyers and judges have grown weary of extended articulation. *See, e.g.*, *United States v. Hernandez*, 23-CR-530 (GRB), DE 18 at 3 ("I will not belabor the horrific conditions of the MDC to this Court, as Your Honor is well aware of the national disgrace it has become.").

These circumstances present a conundrum.  Evaluating the statutory factors indicates that a sentence of incarceration is warranted.  On the other hand, the defendant, like the defendant in *Chavez*, is over 70 years of age, faces significant health challenges and has no criminal record.  Thus, a sentence of incarceration imposed, if that sentence would be served at the MDC, would most assuredly be excessive under § 3553.  *Griffin*, 2024 WL 2891686, at *3 ("In the end, the most important part of the instant Section 3553(a) analysis is that the most 'effective manner' of correctional treatment in this case did not include a fractured eye socket.").  As such, the possibility that the defendant would be designated to MDC for some or all of the sentence proves, under present circumstances, unacceptable.

Thus, the defendant is hereby sentenced to a term of imprisonment of nine months.  The defendant will remain on bail and pre-trial supervision under the same terms and conditions that have governed his release to this point, until a facility is designated by the BOP for service of his sentence.  Assuming that the BOP designates a facility *other* than the MDC, then matters will proceed accordingly.  However, if the BOP opts to designate MDC as the relevant facility, then the imposed term of imprisonment will be vacated and, in its place, the defendant shall serve nine months of home incarceration with electronic monitoring, with the costs of such to be paid by the defendant.

Providing that a term of incarceration be converted to home confinement in the event the BOP designates MDC as the carceral institution is undoubtedly unusual, yet is rooted in factors specifically incorporated into the statutory scheme.  Several statutory considerations support this outcome.  *See, e.g.*, 18 U.S.C. § 3553(a)(1) (mandating consideration of the "characteristics of the defendant"); § 3553(a)(1)(A) (need to consider "just punishment"); § 3553(a)(2)(D) (requiring sentencing court to consider defendant's "needed . . . medical care"); § 3553(a)(3)

("the kinds of sentences available"); *Griffin*, 2024 WL 2891686, at *3 (basing compassionate release from MDC on § 3553(a)(2)(D)'s command that "the sentence must also account for the defendant's 'medical care' needs and, more generally, the need to provide 'correctional treatment in the most effective manner.'").

Congress has required that sentencing courts consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). The disparity factor encompasses a national measure, rather than one limited to local or case-specific comparisons. *United States v. Stewart*, No. 23-6330-CR, 2024 WL 3517853, at *2 (2d Cir. July 24, 2024) ("The primary purpose of Section 3553(a)(6) is 'to minimize nationwide disparities.'"). This factor applies with particular force to this case. A tax offender who is similarly—or even identically—situated to the defendant located anywhere else would not be sentenced to a term of incarceration at the MDC. For all of the reasons discussed herein, the present conditions at MDC make such a sentence materially different than one served at a jail or prison elsewhere in the United States that is appropriately managed. A sentence served at MDC is materially different and necessarily disparate from one served elsewhere. Thus, the sentence imposed represents the best approach the Court can fashion under the circumstances to effect all the statutory purposes.

In addition to the foregoing, the Court imposes restitution in the amount of $554,241, a fine of $120,000 and $1,200 special assessment. I will not impose supervised release subsequent to the term of imprisonment as I do not believe that it will serve any of the purposes of the sentencing statute. I find, taken together, this sentence is sufficient but not greater than

16

necessary to comply with the purposes of the guidelines and the statutory scheme while

reflecting the seriousness of the crime.

**SO ORDERED.**

Dated: Central Islip, New York
       August 5, 2024

<u>/s/ Gary R. Brown</u>
GARY R. BROWN
United States District Judge